**IN THE UNITED STATES BANKRUPTCY COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

| | |
|---|---|
| **IN RE:** | **CHAPTER 13** |
| **JOSEPH BUSBY** | **CASE NO. 0702717EE** |
| **BRANDY BUSBY** | |

| | |
|---|---|
| Hon. David F. Linzey<br>Post Office Box 3789<br>Brookhaven, MS  39603 | Attorney for Debtors |
| Hon. Charles H. Keeton<br>1038 Highway 471<br>Brandon, MS  39042 | Attorney for Wells Fargo Financial, Inc. |
| Hon. Harold J. Barkley, Jr.<br>Post Office Box 4476<br>Jackson, MS 39296-4476 | Chapter 13 Trustee |
| Hon. Todd S. Johns<br>Post Office Box 4476<br>Jackson, MS 39296-4476 | Attorney for Chapter 13 Trustee |

Edward Ellington, Judge

**FINDINGS OF FACT
AND CONCLUSIONS OF LAW ON THE
<u>TRUSTEE'S OBJECTION TO PROOF OF CLAIM</u>**

**THIS MATTER** came before the Court on the *Trustee's Objection to Proof of Claim* of

Wells Fargo Financial Mississippi, Inc. (Claim No. 2) and the *Response to Trustee's Objection to*

*Proof of Claim of Wells Fargo* filed by Wells Fargo Financial, Inc.[1] Having considered the pleadings, briefs and *Statement of Facts*, the Court finds that the objection should be sustained.

## FINDINGS OF FACT

In the *Statement of Facts* submitted to the Court, the parties stipulated to the following:

1. On or about June 25, 2005, the Debtors, Joseph and Brandy Busby, purchased a 2002 Ford F150 pickup, VIN 1FTRW08L82K859991 (herein the "Vehicle") pursuant to terms of an installment sales contract (herein the "Contract"). The Debtors traded in a 2002 Chevrolet Monte Carlo (herein the "trade-in").

2. The Contract was subsequently assigned to Wells Fargo by the dealer and Wells Fargo is now the sole owner and holder of same.

3. Under the terms of the Contract, Wells Fargo has a senior security interest and first lien on the Vehicle, which is duly perfected by having said first lien recorded on the Debtors' Certificate of Title for the Vehicle.

4. In order to acquire the Vehicle, the Debtors financed $29,128.73, which included a $5.00 inspection fee, sales tax of $634.23.00 (sic), a service contract of $800.00, and the Debtors' trade-in of their existing vehicle that had a "negative equity" of $5,500.00.

5. The Debtors admitted the following in their responses to discovery propounded by Wells Fargo:

---

[1] On the front page of the proof of claim form, it states that the name of the creditor is *Wells Fargo Financial Mississippi, Inc.* However, the attached *Certificate of Title* states that the lienholder is Wells Fargo Financial Acceptance. For purposes of this opinion, the creditor which holds the lien on the vehicle will be called Wells Fargo.

a) they made no other efforts to obtain financing related to the 2002 Chevrolet Monte Carlo;

b) they made no efforts to sell the 2002 Chevrolet Monte Carlo;

c) they never contacted the lender that financed the 2002 Chevrolet Monte Carlo to obtain a payoff amount;

d) they would have continued to make monthly payments on the 2002 Chevrolet Monte Carlo if they had not traded it in;

e) the reason the 2002 Chevrolet Monte Carlo was traded-in was to obtain another vehicle;

f) they would not have purchased the service contract for the Ford F150 if they had not purchased the Vehicle;

g) they would not have traded in the Monte Carlo if they had not purchased the Ford F150;

h) they would not have paid off the loan on the Monte Carlo if they had not purchased the Ford F150;

i) they agreed to have the outstanding balance of the Monte Carlo paid off by the new note financing the Ford F150;

j) that the financing provided by Wells Fargo enabled them to pay off the note on the Monte Carlo which allowed them to purchase the Ford F150;

k) they would not have been able to afford monthly payments on both the Monte Carlo and the Ford F150;

> l) the only reason they traded in the Monte Carlo was related to the purchase of the Ford F150; and
>
> m) the financing of the negative equity in the Monte Carlo was an integral part of the purchase of the Ford F150.

6. On August 21, 2007, the Debtors commenced this case under Chapter 13.

7. As of the petition date in this case, the net payoff due and owing to Wells Fargo under the Contract was $26,308.22, plus interest accruing thereon at the rate of 13.75% per annum. Wells Fargo filed a proof of claim for that amount on September 24, 2007.

8. The Debtors' proposed Chapter 13 plan acknowledges the full amount owing to Wells Fargo under the Contract and proposed to pay the same at 12.00% interest. However, the Trustee filed an Objection to Proof of Claim filed by Wells Fargo. The Trustee objected to the payment of $26,308.22 on the basis the Vehicle was not secured solely by the purchase money of the Vehicle. The Trustee went on to say that Wells Fargo had advanced $5,500.00 as negative equity in a trade-in. Therefore, the Trustee submits that the claim should be paid for the value only, i.e., $20,808.22, and the difference in the proposed plan payments and the amended plan payments of the value plus 12% should be used to pay an increased pro rate distribution to unsecured creditors with the Trustee's Office to determine the correct percentage. The Trustee did not object to the value of the service contract ($800.00) being included in the value of the claim. Nor did the Trustee request the claim be "transformed" into an unsecured claim due to the presence of the negative equity.

9. Wells Fargo responded to such treatment on the basis that it believes that the new paragraph added to the end of Sec. 1325(a) of the Bankruptcy Code prevents the Debtors and/or Trustee from using the provisions of Sec. 506(a) of the Bankruptcy Code to bifurcate its claim based on the Vehicle's value as of the petition date.

10. There is no dispute that if Wells Fargo's secured claim for the Vehicle met all of the requirements of the above provision, then the Debtors/Trustee could not use the Chapter 13 to "strip-down" the amount owed to Wells Fargo from $26,308.22 to $20,808.22. Further, there is no dispute that Wells Fargo's secured claim met four of the five Section 1325(a) requirements: (1) "the debt was incurred within 910 days preceding the date of the filing of the petition," (2) Wells Fargo has a "security interest," (3) Wells Fargo's collateral "consists of a motor vehicle" and (4) the motor vehicle "was acquired for the personal use of the debtor."

The only dispute is whether Wells Fargo's secured claim also met Bankruptcy Code Section 1325(a)'s "purchase money security interest" requirement. The Trustee contends that Wells Fargo's security interest was not "purchase money security interest" because the amount financed included a negative equity component.

*Statement of Facts,* May 27, 2008.

## CONCLUSIONS OF LAW

### I.

This Court has jurisdiction of the subject matter and of the parties to this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A) and (L).

5

## II.

### A.

The issue before the Court involves the interpretation of the so-called hanging paragraph[2] which was added to 11 U. S. C. § 1325 (a)[3] as part of the *Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA)*.

Since the enactment of BAPCPA, the application of the hanging paragraph has been addressed by various courts. The majority of these cases have held that negative equity[4] does not constitute part of the PMSI on the vehicle.

This Court is aware of six other courts within the Court of Appeals for the Fifth Circuit which have considered the issue of negative equity: *see In re Brodowski,* 2008 WL 2852878 (Bankr. S.D. Tex. July 22, 2008); *In re Steele,* 2008 WL 2486060 (Bankr. N.D. Tex. June 12, 2008); *In re*

---

[2]As succinctly stated by Judge Leif M. Clark: "The writers of the statute in 2005 used a convention not previously used in the Bankruptcy Code (or in most other federal enactments, for that matter). They appended new 'flush' paragraphs at the end of a series of numbered subsections, but did not assign any numbering or lettering to designate the separate paragraph. The placement of the paragraph in this particular case makes it part of section 1325(a), but the lack of any numbering makes it difficult to reference in briefing and opinions. While many courts have adopted the convention using the asterisk to refer to this newly appended paragraph. . .at least one apt judge recognized the problem this convention presents for those searching the Westlaw and Lexis databases due to the fact that the asterisk is a wildcard character. Thus, this court will adopt all of these conventions by referencing section 1325(a)(*), the 'hanging paragraph,' and the '910-day provision' interchangeably." *In re Sanders,* 377 B.R. 836, 841-42, n. 3 (Bankr. W.D. Tex. 2007).

[3]Hereinafter, all code sections refer to the Bankruptcy Code found at Title 11 of the United States Code unless specifically noted otherwise.

[4]The term *negative equity* is a term of art and is not defined in the Bankruptcy Code, *Black's Law Dictionary* or the Uniform Commercial Code. It is a term commonly used in the automobile industry to describe the difference between a vehicle's outstanding loan balance and the vehicle's market value. *Americredit Financial Services, Inc. v. Penrod (In re Penrod),* 2008 WL 3854465, *4 (9th Cir. BAP 2008); *In re Peaslee,* 358 B.R. 545, 255 (Bankr. W.D.N.Y. 2006). In the case at bar, the parties agree that the amount of negative equity in question is $5,500.

*Sanders,* 377 B.R. 836 (Bankr. W.D. Tex. 2007); *In re Blaylock,* No. 07-11327-DWH (Bankr. N.D. Miss. October 26, 2007); *In re Pharis,* No. 07-BK-30527 (Bankr. W.D. La. October 10, 2007); *In re Dale,* No. 07-32451-H5-13 (Bankr. S.D. Tex. September 17, 2007). Five of the six courts have followed the majority position that negative equity is not included in the PMSI.

In his recent opinion, Judge Jeff Bohm discusses the three Texas cases of *Steele, Sanders* and *Dale*:

> Although these three cases agree that negative equity should not be included in PMSI and therefore not protected by § 1325, they are split on how to handle the portion of the claim representing negative equity. In *Sanders,* Bankruptcy Judge Leif Clark did not apply the transformation rule[5], but arrived at an interpretation of § 1325 which results in an identical outcome–none of the claim is subject to a PMSI and therefore the entire claim is subject to cram down under § 506. *In re Sanders,* 377 B.R. 835, 858 (Bankr. W.D. Tex. 2007). Conversely, in *Dale* and *Steele,* Bankruptcy Judges Karen Brown and Michael Lynn both followed the dual-status rule and prorated the prepetition payments made under the loan to determine what amount of the claim is still secured by the PMSI and what amount is non-PMSI. *In re Dale,* No. 07-32451, slip op. at 12 (Bankr. S.D. Tex. 2007); *In re Steele,* Case No. 08-40282, 2008 Bankr. Lexis 1851, at *26 (Bankr. N.D. Tex. June 12, 2008). This Court respectfully disagrees with Judge Clark and follows the dual-status rule.

*In re Brodowski*, 2008 WL 2852878, *1 (footnote added).

The remaining Fifth Circuit cases from the Northern District of Mississippi and the Western District of Louisiana are split. Judge David W. Houston, III adopted the dual status rule and held that the negative equity would "be treated as an unsecured portion of the debt to be paid as all other general unsecured creditors." *In re Blaylock,* No. 07-11327-DWH, p. 3 (Bankr. N.D. Miss. October 26, 2007).

Judge Stephen V. Callaway from the Western District of Louisiana is the only court in the

---

[5]Under the transformation rule, the secured creditor does not have a PMSI because the non-purchase money component, i.e. the negative equity, transforms the entire claim into a non-purchase money security interest.

7

Fifth Circuit to hold that the hanging paragraph applies to negative equity and to any other fees and charges associated with the purchase of a 910 vehicle. *See In re Pharis,* No. 07-BK-30527 (Bankr. W.D. La. October 10, 2007).

This Court respectfully disagrees with Judge Clark and Judge Callaway and adopts the dual-status rule for the reasons expressed below.

**B.**

The hanging paragraph, which has become the "Rorschach Inkblot Test" of the bankruptcy bench and bar, is found between § 1325(a)(9) and § 1325(b), and states:

> For purposes of paragraph (5)[6], section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

11 U. S. C. § 1325(a)(*) (footnote added).

Simply restated, the hanging paragraph prohibits the bifurcation of a claim under § 506 if four requirements are met: (1) the creditor has a purchase money security interest which secures the debt; (2) the debt was incurred within 910 days of the date the petition was filed; (3) the collateral securing the debt is a motor vehicle; and (4) the motor vehicle was acquired for the personal use of the debtor. In their *Statement of Facts*, the parties agreed that Wells Fargo's secured claim met three of the four[7] requirements. The dispute lies in whether Wells Fargo's secured claim is a purchase money security interest (PMSI). Wells Fargo answers in the affirmative; however, the

---

[6]Paragraph 5 of § 1325(a) allows for the "cram-down" of a secured claim from the amount owed to the value of the collateral.

[7]In their stipulation, the parties break down the hanging paragraph into five elements. However, most courts and treaties break the hanging paragraph into four elements.

Chapter 13 Trustee, Harold J. Barkley, Jr. (Trustee), contends Wells Fargo does not have a PMSI because negative equity was included in the amount financed.

The term purchase money security interest is not defined in the Bankruptcy Code. Therefore, courts have often turned to the Uniform Commercial Code (UCC) in their efforts to determine the definition[8]. In the Mississippi version of the UCC, the provisions relating to secured transactions are found at § 75-9-101, et seq. Purchase money security interest is defined in § 75-9-103(b)(1), and states in pertinent part:

> (b)  A security interest in goods is a purchase-money security interest:
>
>> (1)  To the extent that the goods are purchase-money collateral with respect to that security interest; . . . .

Miss. Code § 75-9-103(b)(1) (1972).

Section 75-9-103(a) gives further guidance in defining purchase money collateral and purchase money obligation as follows:

> (a)  In this section:
>
>> (1)  "Purchase-money collateral" means goods or software that secures purchase-money obligation incurred with respect to that collateral; and
>>
>> (2)  "Purchase-money obligation" means an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used.

Miss. Code § 75-9-103(a)(1) and (2) (1972).

In its brief, Wells Fargo concedes that "the Vehicle cannot be 'purchase money collateral' as that phrase is used in the Uniform Commercial Code." *Memorandum of Law,* p. 31 (May 27,

---

[8]*Americredit Financial Services, Inc. v. Penrod (In re Penrod),* 2008 WL 3854465, *5-6 (9th Cir. BAP 2008)

9

2008). Therefore, the negative equity rolled into the purchase price of the Vehicle must be an obligation that is either (1) part of the price of the collateral or (2) value given to enable the Debtor to acquire rights in or the use of the collateral.

Neither the UCC nor the Mississippi Code defines "price of collateral" or the "value given to enable," however, the Official Comment to § 9-103 provides guidance[9] in determining what the drafters of the UCC meant by these two terms.

In his opinion of *In re Brodowski,* 2008 WL 2852878 (Bankr. S.D. Tex. July 22, 2008), Judge Jeff Bohm aptly discusses the comments to UCC § 9-103 and the other arguments surrounding the issue at bar. In his opinion, Judge Bohm concludes that negative equity is not part of the PMSI. Since the version of § 9-103 codified by Texas and Mississippi are identical, rather than "re-inventing the wheel," this Court adopts Judge Bohm's discussion of § 9-103 as quoted below:

> Comment 3 to § 9.103 states that, for purposes of § 9.103(a)(2), "the 'price' of collateral or the 'value given to enable' includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations." Comment 3 further states that "(t)he concept of 'purchase-money security interest' requires a close nexus between the acquisition of collateral and the secured obligation." Tex. Bus. & Com. Code Ann. § 9.103, cmt. 3.
>
> A frequent refrain in the cases holding that negative equity is not part of PMSI is that the payment of old loans by the new lender is "merely an accommodation which facilitates each transaction" rather than "value given to enable the debtor to acquire rights in or the use of the collateral." *Price,* 363 B.R. at 741. The Court agrees with the characterization of the purchase of the new vehicle and the refinancing of the negative equity in the old vehicle as two separate and distinct transactions. This second transaction, paying off the balance due on the first vehicle's loan, has

---

[9]While Mississippi has not adopted the official comments to the UCC, courts have "looked to official comments about uniform law, when those laws have been adopted all but verbatim by the legislature, as the most informed source explaining provisions of the original enactment." *Holifield v. Bancorpsouth, Inc.,* 891 So.2d 241, 248 (Miss. Ct. App. 2002). Therefore, the Court will examine the official comments for guidance.

accurately been described as a "convenient but unnecessary option for a consumer purchasing a replacement vehicle." *Peaslee,* 358 B.R. at 557. Simply put, although the refinancing of negative equity is increasingly commonplace and makes such transactions practical, it is not a legal requirement for the debtor to acquire rights in the collateral and therefore does not "enable" the acquisition of rights in the new vehicle.

The Court also agrees with the line of cases rejecting the argument that these two separate transactions–the purchase of the second car and the refinancing of the negative equity–share a "close nexus" as required by Comment 3 to § 9.103.

. . . .

Finally, many courts have concluded that negative equity is not similar to the types of obligations expressly listed in Comment 3 to § 9.103 ("sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations"). . . .Negative equity is not a similar obligation to the enumerated list in Comment 3 to § 9.103 because it is unrelated to the acquisition of or retention of the subject vehicle. Instead, as previously stated, this is essentially a second transaction (i.e. refinancing of debt) that is simply included in one set of disclosures for the convenience of both parties.

To review, the Court concludes that negative equity is not an obligation which can be secured by a PMSI for the foregoing reasons: (1) refinancing the negative equity does not "enable" the debtor to acquire rights in the collateral (i.e. the second vehicle); (2) as such, the two transactions do not share a "close nexus" as required by Comment 3 to § 9.103; (3) the definition of price used in the Texas Motor Vehicle Installment Sales Act is not relevant because it is essentially a consumer protection act[10]; and (4) negative equity is not sufficiently similar to the enumerated list in Comment 3 to § 9.103. . . .

Since the Court has found that the negative equity is not protected as part of the PMSI securing the vehicle, the next issue is how should that negative equity be addressesed. . . .

Comment 3 to § 9.103 describes the dual-status rule as follows: "[a] security interest may be a purchase-money security interest to some extent and a non-purchase-money security interest to some extent." For non-consumer goods transactions, § 9.103(f) explicitly adopts this rule and rejects the alternative transformation rule. Under the transformation rule, "any cross-collateralization, refinancing, or the like destroys the

---

[10]Mississippi's Motor Vehicle Sales Finance Law is found at § 63-19-1, et. seq. (1972). Similar to the Texas statutes, Mississippi's definition of *cash sales price* does include taxes, registration fees, etc., but no mention is made of negative equity.

11

purchase-money status entirely." Tex. Bus. & Com.Code Ann. § 9.103, cmt. 3.

*In re Brodowski,* 2008 WL 2852878, at *3-6 (citations omitted)(footnote added).

As stated previously, § 75-9-103 of the Mississippi Code is identical to § 9.103 of the Texas Business & Commercial Code.  Subsection (h) of § 75-9-103 states that in consumer goods transactions, the courts are to determine whether to apply the transformation or dual-status rule. Therefore, like Judge Bohm, this Court finds that the dual-status rule is the "more 'sensitive'"[11] rule and hereby adopts it.

### C.

Since the Court has adopted the dual-status rule, the Court must now determine which amount is shielded from bifurcation by the hanging paragraph.  According to the proof of claim filed by Wells Fargo and the *Statement of Facts*, the total amount financed by the Debtors was $29,128.73.  This consists of:

| | |
|---|---|
| Vehicle price | $22,818.73 (which includes sales tax of $634.23) |
| Service contract | $800 |
| Inspection fee & filing fee | $10[12] |
| Negative equity | $5,500 |

Applying the dual-status rule, Wells Fargo has a PMSI in the price of the vehicle, the sales tax, service contract, inspection fee and filing fee in the amount of $23,628.73, which represents 81.1% of the total amount financed.  Pursuant to its proof of claim, as of the petition date, Wells Fargo was owed $26,308.22.  Therefore, $21,335.97 ($26,308.22 x .811) of Wells Fargo's claim is a PMSI and

---

[11] *Id.* at *7

[12] The Stipulation of Facts states that the inspection fee was $5; however, upon a review of the note, the parties failed to mention the $5 filing fee.  If the $5 filing fee is not included, the amount of Wells Fargo's claim would be $29,123.73 and not agreed amount of $29,128.73.

protected under the hanging paragraph. Since the Debtors' plan was confirmed on March 24, 2008, the $21,335.97 shall be paid through the remainder of the plan at 12% interest. The balance of $4,972.25 shall be treated as all other unsecured creditors.

**D.**

The Court will note that on August 6, 2008, the Court of Appeals for the Eleventh Circuit became the first circuit court to address the hanging paragraph and negative equity. In *In re Graupner*, 2008 WL 2993570 (11th Cir. August 6, 2008), the Eleventh Circuit affirmed the bankruptcy and district courts' decisions that negative equity was protected by the hanging paragraph.

The Eleventh Circuit's opinion in *Graupner* appears to this Court to rely heavily on reading the definition of "cash sale price" found in the Georgia Motor Vehicle Sales Finance Act (Georgia MVSFA) *in pari materia* with the UCC. The Georgia MVSFA was amended in 1999 to include the following language: "The cash sales price may also include any amount paid to the buyer or to a third party on behalf of the buyer to satisfy a lease on or a lien on or a security interest in a motor vehicle used as a trade-in on the motor vehicle which is the subject of a retail installment transaction under this article." O.C.G.A. § 10-1-31(a)(1). The Eleventh Circuit read this definition *in pari materia* with O.C.G.A. § 11-19-103 (UCC) and found that the hanging paragraph did apply to negative equity.

However, upon reading Mississippi's Motor Vehicle Sales Finance Law (Mississippi MVSFL) found at Miss. Code § 63-19-1, et. seq., Mississippi's MVSFL does not have language similar to the Georgia MVSFA. Therefore, even if this Court read the Mississippi MVSFL *in pari materia* with the definitions found in Miss. Code § 79-3-103, its opinion that the hanging paragraph did not apply to negative equity would not change.

13

## CONCLUSION

The *Bankruptcy Abuse Prevention and Consumer Protection Act of 2005* was passed by Congress to remedy perceived abuses by debtors. The hanging paragraph was a specific remedy to a perceived abuse by debtors who purchased a new vehicle shortly before filing bankruptcy, and then upon filing, striped the secured claim down to the value of the vehicle. This is not the situation in the case at bar.

The refinancing of negative equity with the purchase of a new vehicle has been around for many years; therefore, Congress could have enacted specific language in the hanging paragraph in order to protect the negative equity as PMSI. However, Congress did not do so. Consequently, "the Court finds that the most equitable solution to this problem is to exclude negative equity from the protection of the hanging paragraph and to apply the dual-status rule to protect the proper amount of the PMSI held by the lender." *Id.* at *8.

A separate judgment consistent with this opinion will be entered in accordance with Rules 9014 and 9021 of the Federal Rules of Bankruptcy Procedure.